UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

DAVID RODRIGUEZ,

     Petitioner,

v.                                          Case No. 8:18-cv-1595-KKM-JSS

SECRETARY, DEPARTMENT
OF CORRECTIONS,

     Respondent.

_____/

## ORDER

     David Rodriguez, a Florida state prisoner, files a pro se Petition for Writ of Habeas Corpus under 28 U.S.C. § 2254, challenging his state convictions for first-degree murder, robbery with a firearm, and falsely reporting a crime to law enforcement. (Doc. 1.) Having considered the petition (Doc. 1), the response in opposition (Doc. 10), and Rodriguez's reply (Doc. 14), the Court denies both the petition and a certificate of appealability.

## I. BACKGROUND

### A. Procedural History

     A state jury convicted Rodriguez of the above crimes and specifically found that Rodriguez discharged a firearm causing death during the commission of the murder and the robbery. (Doc. 10-3 at 424, 426.) The trial court sentenced Rodriguez to life with a 25-year mandatory minimum term for the murder, 25 years with a 25-year mandatory

minimum term for the robbery, and time served for falsely reporting a crime with all terms of imprisonment, including the mandatory minimum terms, to run concurrently. (Doc. 10-3 at 435–43.) The state appellate court affirmed the convictions and sentences. (Doc. 10-6 at 44.) The state post-conviction court denied Rodriguez relief after an evidentiary hearing (Doc. 10-6 at 169–82), and the state appellate court affirmed. (Doc. 10-6 at 248.) Rodriguez's federal petition follows.

B. Factual Background[1]

Colen Charles Thomas died from a single gunshot wound to his back at his home in Tampa, Florida. (Doc. 10-4 at 476–77, 726–37.) Thomas told a neighbor after the shooting that "Scottie" and two other white men shot him and left in a black Jeep. (Doc. 10-4 at 477.) When police arrived, Thomas recounted a similar story—that two white people shot him and left in a black Jeep Cherokee. (Doc. 10-4 at 529.) And another neighbor saw two men drive off in a Jeep after the shooting. (Doc. 10-4 at 505–06.)

Police discovered that one of Thomas's friends named Scott Arthur drove a black sports utility vehicle. (Doc. 10-4 at 557–58, 561, 563.) A detective testified that, after she spoke with Scott Arthur, the investigation turned to Rodriguez and another male named Johnny Acevedo. (Doc. 10-4 at 565–67.)[2]

---

[1] The facts derive from the trial transcript and appellate briefs.

[2] Arthur did not testify at trial. Trial counsel objected to the detective's testimony citing *Crawford v. Washington*, 541 U.S. 36 (2004) and the Sixth Amendment right to confrontation. (Doc. 10-4 at 565–67).

Two friends who often bought drugs with Rodriguez reported to police that Rodriguez confessed that he committed the murder. (Doc. 10-4 at 759–64, 790–802.) Rodriguez told the friends that, the night before, he shot and killed someone during a robbery that he committed with Acevedo and a man named "Scottie." (*Id.*) Rodriguez split the proceeds of the robbery, which included money and crack cocaine, with his accomplices at a nearby diner. (*Id.*) Rodriguez buried the firearm used in the murder underneath a doghouse in his backyard and reported the gun stolen to police to divert their investigation. (*Id.*) After the two friends provided police sworn statements, police gave them money for a hotel and Crime Stoppers gave them a reward. (Doc. 10-4 at 764–65, 802–04.)

Other evidence corroborated their story. A waitress who worked at the diner saw two men enter on the night of the murder, use the bathroom and telephone, and leave. (Doc. 10-4 at 642–46.) Surveillance video at the diner depicted Rodriguez and Acevedo as the two men. (Doc. 10-4 at 671–74.) On the night of the shooting, Rodriguez's wife remembered that Acevedo came over with his wife to visit and left with Rodriguez. (Doc. 10-5 at 46–48). A short time later, Rodriguez returned by himself. (Doc. 10-5 at 48.)

The day after the murder, Rodriguez reported his firearm stolen to police. (Doc. 10-4 at 679–84.) During the execution of a search warrant at Rodriguez's home, police found the firearm underneath the doghouse in Rodriguez's backyard. (Doc. 10-5 at

74–76.) A firearms expert opined that the firearm found in Rodriguez's backyard fired a bullet casing found at the scene of the murder. (Doc. 10-5 at 357.)

Rodriguez agreed to go to the police station to discuss the stolen gun report. (Doc. 10-5 at 144–47.) Rodriguez told detectives that someone had stolen his gun from his home the night before the robbery and murder, claimed that he was home with his wife on the night of the robbery and murder, and denied any involvement in the robbery and murder. (Doc. 10-5 at 151–87, 197–231, 238–45.) After one of the detectives arrested Rodriguez for filing a false police report and told Rodriguez that his wife was coming to the police station for an interview, Rodriguez said that "he didn't want to be the first to spill the beans." (Doc. 10-5 at 277–80.)

Rodriguez waived his constitutional rights, admitted that he was involved in the robbery and murder, and had lied to protect Acevedo. (Doc. 10-5 at 282–86, 310.) The day of the crimes, Acevedo and Arthur talked about robbing a drug dealer, and Acevedo asked Rodriguez to bring his gun. (Doc. 10-5 at 312–13.) Rodriguez went with Acevedo and Arthur to the drug dealer's home, and Rodriguez handed his gun to Acevedo. (Doc. 10-5 at 284–88, 296, 313–14.) Rodriguez told Acevedo not to shoot the drug dealer and only to scare him. (Doc. 10-5 at 290–91.) Rodriguez stood outside while Acevedo and Arthur walked up to the drug dealer's home. (Doc. 10-5 at 288, 313.) About fifteen minutes later, Rodriguez heard a gunshot and ran away to a diner close by where Rodriguez

called Arthur and Acevedo to pick him up. (Doc. 10-5 at 288–89, 293–96, 313.) Arthur and Acevedo picked Rodriguez up, and Acevedo gave Rodriguez $65.00 and kept the gun. (Doc. 10-5 at 289, 297, 304, 315–16.) Acevedo said that he had to shoot the drug dealer in the leg. (Doc. 10-5 at 316.) Rodriguez reported his gun stolen the next day because Rodriguez learned that the drug dealer died and Rodriguez wanted the police to know that he no longer had the gun. (Doc. 10-5 at 297, 311.)

## II. STANDARDS OF REVIEW FOR A SECTION 2254 APPLICATION

The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) governs this proceeding. *Carroll v. Sec'y, DOC*, 574 F.3d 1354, 1364 (11th Cir. 2009). Habeas relief under the AEDPA can be granted only if a petitioner is in custody "in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Section 2254(d) provides that federal habeas relief cannot be granted on a claim adjudicated on the merits in state court unless the state court's adjudication:

> (1)    resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2)    resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

For purposes of § 2254(d)(1), a decision is "contrary to" clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 413 (2000). The phrase "clearly established Federal law" encompasses the holdings only of the United States Supreme Court "as of the time of the relevant state-court decision." *Id.* at 412. A decision involves an "unreasonable application" of clearly established federal law "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.*

For purposes of § 2254(d)(2), a state court's findings of fact are presumed correct. *See Rolling v. Crosby*, 438 F.3d 1296, 1301 (11th Cir. 2006) ("The factual findings of the state court, including the credibility findings, are presumed to be correct . . . ."). A petitioner can rebut the presumption of correctness afforded to a state court's factual findings only by clear and convincing evidence. § 2254(e)(1).

The AEDPA was meant "to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Bell v. Cone*, 535 U.S. 685, 693 (2002). Accordingly, "[t]he focus . . . is on whether the state court's application of clearly established federal law is objectively unreasonable, and . . . an unreasonable

application is different from an incorrect one." *Id.* at 694. As a result, to obtain relief under the AEDPA, "a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011); *see also Lockyer v. Andrade*, 538 U.S. 63, 75 (2003) (stating that "[t]he state court's application of clearly established federal law must be objectively unreasonable" for a federal habeas petitioner to prevail and that the state court's "clear error" is insufficient).

When the last state court to decide a federal claim explains its decision in a reasoned opinion, a federal habeas court reviews the specific reasons as stated in the opinion and defers to those reasons if they are reasonable. *Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018). When the relevant state-court decision is not accompanied with reasons for the decision—such as a summary affirmance without discussion—the federal court "should 'look through' the unexplained decision to the last related state-court decision that does provide a relevant rationale [and] presume that the unexplained decision adopted the same reasoning." *Id.* The state may contest "the presumption by showing that the unexplained affirmance relied or most likely did rely on different grounds than the lower state court's decision . . . ." *Id.*

## III. INEFFECTIVE ASSISTANCE OF COUNSEL STANDARD

Rodriguez brings two claims for ineffective assistance of counsel under the Sixth Amendment. Under the well-known, two-part standard articulated in *Strickland v. Washington*, 466 U.S. 668 (1984), to succeed, he must show both deficient performance by his counsel and prejudice resulting from those errors. *Id.* at 687.

The first part "requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* The lynchpin of this analysis is whether counsel's conduct "was reasonable considering all the circumstances." *Id.* at 688. A petitioner establishes deficient performance if "the identified acts or omissions [of counsel] were outside the wide range of professionally competent assistance." *Id.* at 690. A court "must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." *Id.* "[C]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id.*

The second part requires showing that the deficient performance prejudiced the defense. *Id.* at 687. "An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Id.* at 691. To demonstrate prejudice, a petitioner must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would

have been different. A reasonable probability is a probability sufficient to undermine

confidence in the outcome." *Id.* at 694.

"The question [on federal habeas review of an ineffective assistance claim] 'is not

whether a federal court believes the state court's determination' under the *Strickland*

standard 'was incorrect but whether that determination was unreasonable—a substantially

higher threshold.'" *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009) (quoting *Schriro v.*

*Landrigan*, 550 U.S. 465, 473 (2007)). Consequently, federal petitioners rarely prevail on

claims of ineffective assistance of counsel because "[t]he standards created by *Strickland*

and § 2254(d) are both highly deferential, and when the two apply in tandem, review is

doubly so." *Richter*, 562 U.S. at 105 (quotation and citations omitted).

## IV. <u>ANALYSIS</u>

### A. <u>Ground One</u>

Rodriguez contends that the state court unreasonably denied his motion to suppress

his incriminating statements to the detectives. (Doc. 1 at 4.)

#### 1. <u>State Court's Findings of Fact</u>

After an evidentiary hearing on the motion to suppress, the state court found the

following.[3] On January 23, 2013, a police officer went to Rodriguez's home and asked

Rodriguez to come to the police station to discuss a firearm that Rodriguez reported stolen.

---

[3] Facts derive from the state court's order denying the motion to suppress. (Doc. 10-3 at 251–62.)

(Doc. 10-3 at 252.) Rodriguez agreed, and the police officer drove Rodriguez in a patrol car to the police station. (Doc. 10-3 at 253.) The officer neither handcuffed nor restrained Rodriguez and took him to an interview room to meet with detectives. (Doc. 10-3 at 253.) The detectives recorded five interviews with Rodriguez, starting the first interview at 2:23 P.M. and concluding the last interview at 9:03 P.M. (Doc. 10-3 at 253–56).

During the first interview which lasted about half an hour, Rodriguez agreed that he had voluntarily come to the police station. (Doc. 10-3 at 253.) A detective told Rodriguez that the firearm that Rodriguez reported stolen was linked to a murder investigation. (Doc. 10-3 at 253.) The detective told Rodriguez the name of the victim, how the victim died, and asked if Rodriguez was involved. (Doc. 10-3 at 253.) Rodriguez denied involvement, claimed that he was visiting his mother's home when the gun was stolen, and further claimed that he was home with his wife when the murder occurred. (Doc. 10-3 at 253.)

The detectives and Rodriguez took a brief break. (Doc. 10-3 at 254.) During the second interview which lasted less than 10 minutes, Rodriguez agreed to provide the detectives a buccal swab and fingerprints. (Doc. 10-3 at 254.) A detective told Rodriguez that an individual named Scott Arthur said that Rodriguez rode in Arthur's car on the day of the murder. (Doc. 10-3 at 254.) Rodriguez denied riding in Arthur's car, and the

detectives told Rodriguez that the buccal swab and fingerprints would disprove the accusation. (Doc. 10-3 at 254.)

During the third interview, the detectives continued to ask Rodriguez about his involvement in the murder. (Doc. 10-3 at 254.) Rodriguez told the detectives, "I am done with the questions[,]" and asked, "[C]an you call me a lawyer please[?]" (Doc. 10-3 at 254.) The detectives stopped questioning Rodriguez, walked him outside the police station to allow him to smoke, and arranged Rodriguez a ride home. (Doc. 10-3 at 254.) The detectives did not call a lawyer for Rodriguez and instead told him that he was free to leave. (Doc. 10-3 at 254.)

Another detective who interviewed Rodriguez's wife discovered inconsistencies in Rodriguez's version of events. (Doc. 10-3 at 254.) When the detective returned to the police station, the detective arrested Rodriguez outside the police station for filing a false police report. (Doc. 10-3 at 255.) The detective handcuffed Rodriguez and placed him in a holding cell. (Doc. 10-3 at 255.) At this time, the detective had not yet advised Rodriguez of his *Miranda* warnings. When the detective learned that Rodriguez had requested a lawyer, the detective went to the holding cell and asked Rodriguez for the name and telephone number for his lawyer. (Doc. 10-3 at 255.)

Rodriguez provided the detective the name of his lawyer and his telephone number and asked why the detective wanted the information. (Doc. 10-3 at 255.) The detective

told Rodriguez that he would both tell Rodriguez's lawyer about "new developments" and ask his lawyer to come to the police station. (Doc. 10-3 at 255.) Rodriguez asked the detective if Rodriguez's wife would come to the police station, and the detective confirmed that she would. (Doc. 10-3 at 255.) Rodriguez replied, "I didn't want to spill the beans," and proceeded to admit his involvement in the murder. (Doc. 10-3 at 255.)

Rodriguez testified that the detective urged him to tell the truth and threatened to arrest Rodriguez's wife and take his daughter away. (Doc. 10-3 at 255.) According to Rodriguez, he spoke about the murder because he felt threatened. (Doc. 10-3 at 255.) The detective's view, unsurprisingly, differed and he denied threatening Rodriguez. (Doc. 10-3 at 255.) The detective asked whether Rodriguez wanted to speak with a lawyer or proceed with the interview without speaking with a lawyer, and Rodriguez agreed to continue without one. (Doc. 10-3 at 256.)

During the fourth interview which lasted around 20 minutes, the detective asked Rodriguez, "[Y]ou indicated you wanted to break what we call reinitiate talking without a lawyer[,] is that correct?" (Doc. 10-3 at 256.) Rodriguez responded, "[Y]eah[,] uh huh[,] yes sir." (Doc. 10-3 at 256.) After Rodriguez stated that he wanted to speak with the detective without a lawyer present, the detective advised Rodriguez of his constitutional rights for the first time by reading a form which listed those rights. (Doc. 10-3 at 256.) The detective advised Rodriguez that he could invoke his rights and terminate the

interview at any time. (Doc. 10-3 at 256.) Rodriguez continued to incriminate himself. (Doc. 10-3 at 256.)

During a fifth interview which lasted about 10 minutes, the detective reviewed with Rodriguez their earlier unrecorded conversation in the holding cell. (Doc. 10-3 at 256.) Rodriguez confirmed that he had waived his right to have a lawyer present during questioning. (Doc. 10-3 at 256.) The detective asked Rodriguez, "[T]o be clear at that point did I did [*sic*] ask you anything or did I[?]" (Doc. 10-3 at 256.) Rodriguez responded, "no," and explained that he waived his right to have a lawyer present during questioning "because [he] wanted to come clean and tell the truth." (Doc. 10-3 at 256). The state court reasonably interpreted this exchange between the detective and Rodriguez as follows: "Defendant agreed with [the detective] that in their unrecorded conversation at the holding cell [that the detective] did not ask him anything but his attorney's name and number and agreed he asked [the detective] why he wanted to call his attorney." (Doc. 10-3 at 261.)

### 2. State Court's Application of Law to Facts

The state court denied Rodriguez's motion to suppress his statements during the first, second, and third interviews because Rodriguez was not in custody. (Doc. 10-3 at 258.) The state court concluded that Rodriguez voluntarily went to the police station, and police neither arrested nor restrained Rodriguez in any way during those interviews. (*Id.*)

When Rodriguez asked for a lawyer during the third interview, the detectives terminated the interview. (Doc. 10-3 at 259.)

The state court denied Rodriguez's motion to suppress his statements during the fourth and fifth interviews because the detective's request for the name and telephone number for Rodriguez's lawyer was not reasonably likely to elicit an incriminating response. (Doc. 10-3 at 260.) The state court concluded that the detective was more credible than Rodriguez concerning whether the detective had threatened Rodriguez in the holding cell. (Doc. 10-3 at 260.) The state court further concluded that Rodriguez reinitiated the conversation about the crimes when Rodriguez asked why the detective wanted his lawyer's contact information and whether his wife would come to the police station. (Doc. 10-3 at 260.) Before further interrogating Rodriguez about the crimes, the detective confirmed that Rodriguez wanted to proceed without a lawyer and advised Rodriguez of his constitutional rights. (Doc. 10-3 at 260–61.)

### 3. <u>AEDPA Review</u>

Rodriguez asserts that the state court unreasonably applied *Rhode Island v. Innis*, 446 U.S. 291 (1980) and unreasonably determined facts. (Doc. 1 at 4.)

*Miranda v. Arizona*, 384 U.S. 436, 444 (1966), holds that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure

the privilege against self-incrimination." Before any questioning, police must inform the

defendant that he has the right to remain silent, any statement can be used as evidence

against him, and he has the right to have a retained or appointed attorney present. 384 U.S.

at 444–45. If the defendant states that he wants an attorney present, police may not

interrogate the defendant until an attorney is present. *Innis*, 446 U.S. at 297–98 (citing

*Miranda*, 384 U.S. at 473–74). "[T]he term 'interrogation' under *Miranda* refers not only

to express questioning, but also to any words or actions on the part of the police (other

than those normally attendant to arrest and custody) that the police should know are

reasonably likely to elicit an incriminating response from the suspect." *Innis*, 446 U.S. at

301 (footnote omitted).

In *Innis*, police suspected the defendant murdered a taxicab driver with a shotgun

and arrested him. *Innis*, 446 U.S. at 293–94. After a police officer advised the defendant

of his *Miranda* rights, the defendant asked to speak with a lawyer. 446 U.S. at 294. The

officer placed the defendant in the back of a police car and drove him to the police station.

446 U.S. at 294. During the ride to the police station, one officer lamented to another

officer, "[T]here's a lot of handicapped children running around in this area, and God

forbid one of them might find a weapon with shells and they might hurt themselves." 446

U.S. at 294. The defendant interrupted the conversation, directed the officers to turn

around, and led them to a nearby field where the murder weapon was hidden under some

rocks. 446 U.S. at 295. *Innis* held that the officer's remark was not "interrogation" under *Miranda* because the officer neither asked the defendant a question nor made a comment reasonably likely to elicit an incriminating response. 446 U.S. at 302–03.

When Rodriguez told the detectives, "I am done with the questions[,] can you call me a lawyer please," the detectives scrupulously honored Rodriguez's rights, terminated questioning, walked Rodriguez outside the police station, and arranged a ride home for him. (Doc. 10-3 at 254.) While Rodriguez was outside, a detective arrested Rodriguez for filing a false police report after discovering new information in his investigation. (Doc. 10-3 at 255.) When the detective learned that Rodriguez requested a lawyer, the detective asked Rodriguez for the name and telephone number of his lawyer. (Doc. 10-3 at 255.)

The detective's request for the contact information for Rodriguez's lawyer was not reasonably likely to elicit an incriminating response. *Innis*, 446 U.S. at 293–94; *see also United States v. Ware*, 338 F.3d 476, 481 (6th Cir. 2003) ("These questions, however, were principally aimed at finding Ware an attorney. . . . Taken in context, these questions were not even tangentially related to criminal activity, nor did they hint at eliciting incriminating information or prey on any particular susceptibility of the defendant."); *United States v. Cunningham*, 133 F.3d 1070, 1073–74 (8th Cir. 1998) (holding that statements by a police officer to a defendant while trying to locate his attorney were not reasonably likely to elicit an incriminating response); *Sechrest v. Ignacio*, 549 F.3d 789,

806–07 (9th Cir. 2008) ("After Sechrest's conversation with his grandmother, Officer Bogison asked Sechrest if he was going to call his attorney, but Sechrest said no. In context, Officer Bogison's question was simply an attempt to follow up on and implement Sechrest's earlier request, after a delay instigated by Sechrest.").

Rodriguez provided the detective the name of his lawyer and asked both why the detective wanted the information and whether his wife would come to the police station. (Doc. 10-3 at 255.) Because Rodriguez himself initiated a conversation with the detective, the detective could respond. *Edwards v. Arizona*, 451 U.S. 477, 485 (1981) ("[A]n accused, such as Edwards, having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police.").

When Rodriguez further stated, "I didn't want to spill the beans," and proceeded to talk about the crimes, the detective readvised Rodriguez his *Miranda* rights before further interrogating him. (Doc. 10-3 at 255–56.) During the subsequent interrogation, Rodriguez confirmed that he had waived his right to have a lawyer present because he "wanted to come clean and tell the truth." (Doc. 10-3 at 361.)

The detective did not violate Rodriguez's rights, and the state court did not unreasonably apply *Innis*. *See Oregon v. Bradshaw*, 462 U.S. 1039, 1046 (1983) ("Since

there was no violation of the *Edwards* rule in this case, the next inquiry was 'whether a valid waiver of the right to counsel and the right to silence had occurred, that is, whether the purported waiver was knowing and intelligent and found to be so under the totality of the circumstances, including the necessary fact that the accused, not the police, reopened the dialogue with the authorities.'" (citation omitted)).

At the suppression hearing, Rodriguez testified that the detective urged him to tell the truth and threatened to arrest Rodriguez's wife and take his daughter away. (Doc. 10-3 at 255.) Rodriguez claimed that he spoke about the murder only because he felt threatened. (Doc. 10-3 at 255.) The detective denied threatening Rodriguez. (*Id.*) After hearing testimony by both Rodriguez and the detective, the state court found (Doc. 10-3 at 260):

> While the statements outside the cell were unrecorded and conflicting testimony was presented as to how and why Defendant talked, the Court finds [the detective's] testimony more credible than the Defendant.

The state court's credibility determination receives deference in federal court. *Nejad v. Att'y Gen., State of Ga.*, 830 F.3d 1280, 1292 (11th Cir. 2016) ("Determining the credibility of witnesses is the province and function of the state courts, not a federal court engaging in habeas review.'") (quoting *Consalvo v. Sec'y, Dep't Corrs.*, 664 F.3d 842, 845 (11th Cir. 2011)). Because the transcripts of the suppression hearing support the state court's finding (Doc. 10-3 at 245–46), the state court did not unreasonably determine a

fact.[4] And Rodriguez has not shown by clear and convincing evidence that these factual determinations—that the detective was telling the truth—were erroneous. *See* 28 U.S.C. § 2254(e)(1).

Ground One is denied.

## B. Ground Two

At trial, a detective testified that she focused her investigation on Rodriguez and another male named Johnny Acevedo after speaking with Scott Arthur. (Doc. 10-4 at 565–66, 568.) Rodriguez contends that the state court unreasonably applied *Crawford v. Washington*, 541 U.S. 36 (2004) by overruling the defense's objection to this testimony. (Doc. 1 at 6.) On direct appeal, the State of Florida conceded that the trial court violated the state rules governing hearsay but argued that any error was harmless (Doc. 10-6 at 40–41), and the state appellate affirmed without a written opinion (Doc. 10-6 at 44). On federal habeas, the Secretary argues that the error was harmless because overwhelming evidence proved Rodriguez's guilt. (Doc. 10 at 18–20.)

The Court concludes that the state appellate court disregarded the trial court's ruling on the objection and found error, if any, harmless. *Wilson*, 138 S. Ct. at 1196 ("[A] federal habeas court may conclude that counsel has rebutted the presumption on the basis of

---

[4] The Court independently concludes that that the detectives complied with the federal constitution. *See Land v. Allen*, 573 F.3d 1211, 1217 (11th Cir. 2009) (requiring a federal court, as a first step under AEDPA, to "independently ascertain and apply Federal law to determine whether the challenged statement was obtained in accordance with the Constitution").

convincing alternative arguments for affirmance made to the State's highest court or equivalent evidence presented in its briefing to the federal court similarly establishing that the State's highest court relied on a different ground than the lower state court, such as the existence of a valid ground for affirmance that is obvious from the state-court record.").

In *Crawford v. Washington*, the Supreme Court held that the Confrontation Clause of the Sixth Amendment bars the "admission of testimonial statements of a witness who [does] not appear at trial unless he [is] unavailable to testify, and the defendant [had] a prior opportunity for cross-examination." 541 U.S. at 53–54. A statement in response to police interrogation is testimonial "when the circumstances objectively indicate that there is no [ ] ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution." *Davis v. Washington*, 547 U.S. 813, 822 (2006).

A violation of the Sixth Amendment right to confrontation is harmless if the error had no "'substantial and injurious effect or influence in determining the jury's verdict.'" *Mason v. Allen*, 605 F.3d 1114, 1123 (11th Cir. 2010) (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993)). A court analyzes the effect by "looking at several factors, including 'the importance of the witness'[s] testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, . . . and, of course, the overall

strength of the prosecution's case.'" 605 F.3d at 1123–24 (quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 684 (1986)). Prejudice requires more than a reasonable probability that the error contributed to the verdict. 605 F.3d at 1123.

At trial, the detective testified that she focused her investigation on Rodriguez and Johnny Acevedo after speaking with Scott Arthur. (Doc. 10-4 at 565–66, 568.) Arthur's out-of-court testimonial statement to the detective implicated Rodriguez in the murder.

During his audio-recorded confession introduced into evidence at trial, Rodriguez implicated himself in the murder. Rodriguez told the detectives that he was present when Arthur and Acevedo discussed robbing a drug dealer for drugs and money. (Doc. 10-5 at 285.) Acevedo asked Rodriguez to bring a gun with him. (Doc. 10-5 at 286–87.) Rodriguez rode in the car with Arthur and Acevedo to the victim's home. (Doc. 10-5 at 287–88.) Rodriguez handed Acevedo the gun, and Arthur and Acevedo went to the front door of the victim's home. (Doc. 10-5 at 288.) After 10 or 15 minutes, Rodriguez heard a gunshot and left on foot. (*Id.*) Arthur and Acevedo picked up Rodriguez at a nearby diner. (Doc. 10-5 at 289.) Rodriguez claimed that he had told Arthur and Acevedo not to shoot the victim but just to scare him. (Doc. 10-5 at 290–91.)

During a conversation with his friends, Rodriguez also implicated himself in the murder. Rodriguez's friends testified that, the day after the murder, Rodriguez admitted that he shot and killed someone for money and drugs, had used his own gun, had reported

to the police the gun stolen to misdirect the investigation, and had buried the gun underneath a doghouse in his backyard. (Doc. 10-5 at 759–62, 790–97.) Police executed a search warrant at Rodriguez's home and found the gun underneath the doghouse. (Doc. 10-5 at 55–60.) And a firearms analyst opined that the gun found at Rodriguez's home fired a bullet casing found at the scene of the murder. (Doc. 10-5 at 357.)

Also, during the recording of the interrogation played for the jury, a detective explained to Rodriguez how Arthur implicated Rodriguez in the murder. The detective told Rodriguez that "[Arthur] basically lied about you in a murder and your gun is already associated with it." (Doc. 10-5 at 179.) Also, the detective told Rodriguez, "[N]ow again, I told you that the white guy, Scottie said you were in his car; is that correct? I told you he said that." (Doc. 10-5 at 267.) Later during the interrogation, the detective told Rodriguez, "Now let me clear something up because I was lying to you earlier. Scott told us you were the shooter." (Doc. 10-5 at 286.)

Because Arthur's out-of-court statement implicating Rodriguez in the murder was cumulative to testimony by Rodriguez's friends, Rodriguez's confession, and statements by the detectives during the interrogation and other strong, unrebutted evidence at trial proved Rodriguez's guilt, the Sixth Amendment violation had no substantial and injurious effect on the jury's verdict. *Mason*, 605 F.3d at 1123–24; *Hodges v. Att'y Gen., State of Fla.*, 506 F.3d 1337, 1342–43 (11th Cir. 2007); *Parker v. Singletary*, 974 F.2d 1562, 1579 (11th Cir.

1992); *United States v. Hock*, 995 F.2d 195, 197 (11th Cir. 1993). Consequently, the state appellate court did not unreasonably deny the claim. *Richter*, 562 U.S. at 98.

Ground Two is denied.

## C. Ground Three

In his Rule 3.850 motion, Rodriguez asserted that trial counsel was ineffective for not timely moving to disqualify the trial judge and for advising Rodriguez to waive his right to demand recusal. (Doc. 10-6 at 50–52.) Rodriguez contends that the state court unreasonably applied *Strickland* and unreasonably determined facts by denying this claim. (Doc. 1 at 8–9.)

Rodriguez alleged that the trial judge was related to the victim, and Rodriguez asked trial counsel to move to disqualify the trial judge. (Doc. 10-6 at 50.) Trial counsel advised Rodriguez that the trial judge had hired trial counsel at the public defender's office, trial counsel and the trial judge were friends for a long time, and the trial judge was "the most fair judge in the circuit and if she recused herself they would most likely be transferred to a courtroom where he would not receive a fair trial." (Doc. 10-6 at 50–51.) Only after Rodriguez filed a bar complaint against the trial judge did trial counsel move to disqualify the trial judge, who recused herself the same day. (Doc. 10-6 at 51.) Rodriguez asserted that, if trial counsel had moved to disqualify the trial judge earlier, the successor judge

would have granted the motion to suppress his post-arrest statements and the jury would have acquitted him at trial. (Doc. 10-6 at 52.)

The state court held an evidentiary hearing on the claim and summarized trial counsel's testimony at the hearing as follows.[5] Trial counsel advised Rodriguez that the trial judge's family member was related to the victim and the trial judge offered to recuse herself. (Doc. 10-6 at 174.) Trial counsel told Rodriguez that the trial judge was a public defender for many years, had hired trial counsel to work at the public defender's office, and would listen to arguments and read the law to render a fair decision. (Doc. 10-6 at 174.) Trial counsel denied telling Rodriguez either that his relationship with the trial judge would guarantee that the trial judge would grant the motion to suppress or that the trial judge was the "most fair" in the circuit. (Doc. 10-6 at 174.) Trial counsel further denied advising that Rodriguez would not receive a fair trial if a new judge presided over his case. (Doc. 10-6 at 174.)

At a pretrial hearing, the trial judge disclosed her relationship with the victim and conducted a colloquy with Rodriguez who waived his right to recuse the trial judge. (Doc. 10-6 at 175.) Later, Rodriguez asked trial counsel about recusal and suggested that the defense move to recuse the trial judge if the trial judge ruled against the defense. (Doc.

---

[5] The summary derives from the state court's order denying Rodriguez postconviction relief. (Doc. 10-6 at 173–76.)

10-6 at 175.) Trial counsel told Rodriguez that he would not move to recuse a trial judge for that reason, and Rodriguez agreed. (Doc. 10-6 at 175.)

After the trial judge denied Rodriguez's motion to suppress, trial counsel met with Rodriguez again, showed him the order, and asked whether Rodriguez wanted to move to recuse the trial judge. (Doc. 10-6 at 175.) Rodriguez agreed to forgo recusal because the trial judge appeared neither biased nor prejudicial. (Doc. 10-6 at 175.)

The state court found trial counsel credible at the evidentiary hearing (Doc. 10-6 at 177), and the state court's credibility determination receives deference in federal court. *Nejad*, 830 F.3d at 1292. Because the state court accurately summarized both trial counsel's testimony at the postconviction hearing and the trial judge's colloquy with Rodriguez at the pretrial hearing, the state court did not unreasonably determine a fact. (Docs.10-6 at 99–110 and 19-1 at 127–30.) And Rodriguez fails to prove by clear and convincing evidence that the state court's factual determinations were incorrect. *See* 28 U.S.C. § 2254(e)(1).

The state court concluded that Rodriguez failed to prove deficient performance under *Strickland*. (Doc. 10-6 at 177.) Because trial counsel advised Rodriguez that the trial judge would listen to arguments and read the law to render a fair decision and Rodriguez knowingly and voluntarily waived his right to recuse the trial judge based on that competent advice, the state court did not unreasonably deny the claim. Fla. R. Jud. Admin. 2.330(e)(1)

("A motion to disqualify shall set forth all specific and material facts upon which the judge's impartiality might reasonably be questioned, including but not limited to the following circumstances: the party reasonably fears that he or she will not receive a fair trial or hearing because of specifically described prejudice or bias of the judge."); *Arbelaez v. State*, 898 So. 2d 25, 41 (Fla. 2005) ("A mere 'subjective fear [ ]' of bias will not be legally sufficient; rather, the fear must be objectively reasonable.") (citation omitted); *Joshua v. State*, 254 So. 3d 419, 422 (Fla. 4th DCA 2018) ("'[T]he fact that a judge has ruled adversely to the party in the past does not constitute a legally sufficient ground for a motion to disqualify.'" (citation omitted)).

Even if trial counsel had moved to recuse the trial judge and the trial judge had recused herself, the outcome at trial would not have changed. *Strickland*, 466 U.S. at 694. After the trial judge recused herself, trial counsel renewed the motion to suppress the confession at trial. The successor judge acknowledged the renewed motion and did not grant relief. (Doc. 10-5 at 140–41, 253.) Therefore, Rodriguez cannot establish prejudice.

Also, even if the successor judge had granted the renewed motion, other unrebutted evidence proved Rodriguez's guilt. Rodriguez's friends testified that, the day after the murder, Rodriguez admitted to using his own gun to shoot and kill someone for money and drugs, had reported to police the gun stolen to divert the investigation, and had buried the gun in his backyard underneath a doghouse. (Doc. 10-5 at 759–62, 790–97.) Police

executed a search warrant at Rodriguez's home and found the gun underneath the doghouse. (Doc. 10-5 at 55–60.) A firearms analyst opined that the gun recovered from Rodriguez's home fired a bullet casing found at the scene of the murder. (Doc. 10-5 at 357.) Rodriguez's wife saw Rodriguez leave their home with Acevedo on the night of the murder. (Doc. 10-5 at 47–48.) Surveillance video at the diner showed Rodriguez and Acevedo together just after the shooting. (Doc. 10-4 at 674, 765–66, 804.) This unrebutted evidence refuted Rodriguez's claim to the detectives that he was home with his wife the night of the murder. Even without Rodriguez's confession, the jury had ample admissible evidence from which to find Rodriguez guilty. *Peoples v. Campbell*, 377 F.3d 1208, 1244 (11th Cir. 2004); *Stevens v. Zant*, 968 F.2d 1076, 1081–82 (11th Cir. 1992).

In his petition and reply, Rodriguez argues that the state court failed to address the first part of his claim that trial counsel was ineffective for not moving to disqualify the trial judge and only addressed the second part of his claim that trial counsel was ineffective for advising Rodriguez to waive his right to recusal. (Docs. 1 at 8 and 14 at 8.) But trial counsel testified that he did not move to recuse the trial judge because Rodriguez waived his right to recuse the judge. (Doc. 10-6 at 99–101.) Trial counsel competently advised Rodriguez concerning his right to recuse the judge and Rodriguez knowingly and voluntarily waived that right.

In his reply, Rodriguez further argues that no valid strategic reason supported trial counsel's advice. (Doc. 14 at 9.) At the pretrial hearing, the trial judge explained her relationship to the victim as follows (Doc. 19-1 at 129):

> [Prosecutor:]   It's my understanding, Your Honor, that you do not know Margaret Thomas, the victim's mother?

> [Judge:]   No, I don't. As I explained to both the State and the Defense, Johnny Campbell is my uncle on my paternal side. He and my father have different mothers, the same father. My uncle is approximately 10 or 12 years older than my father would be if he were alive. I don't know Ms. Thomas. The name does sound familiar to me, but that is because they have different families.

The trial judge saw the victim's mother in the courtroom and confirmed that she did not remember ever meeting her. (Doc. 19-1 at 129.) Also, at the postconviction hearing, trial counsel testified that the trial judge was a public defender for many years and would listen to arguments and read the law to render a fair decision. (Doc. 10-6 at 174.) Because trial counsel knew that the trial judge did not know the victim's mother and would render a fair decision despite her extended family's relationship with the victim, trial

28

counsel's advice was reasonable. *Strickland*, 466 U.S. at 690 ("[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable . . . .").

Because the jury had ample evidence from which to find Rodriguez guilty even without the confession, Rodriguez could not demonstrate that the outcome would have changed even if trial counsel had moved to recuse the trial judge. *Green v. Nelson*, 595 F.3d 1245, 1252 (11th Cir. 2010); *Zamora v. Dugger*, 834 F.2d 956, 959 (11th Cir. 1987).

Ground Three is denied.

### D. Ground Four

In his Rule 3.850 motion, Rodriguez asserted that trial counsel was ineffective after the trial judge recused herself for not moving for reconsideration of the order denying his motion to suppress his statements to detectives. (Doc. 10-6 at 52–54.) Rodriguez contends that the state court unreasonably applied *Strickland* and unreasonably determined facts by denying this claim. (Doc. 1 at 9–10.)

Rodriguez asserts that overwhelming evidence proved that police unlawfully obtained his statements, the successor judge would have suppressed the statements, and the jury would have acquitted him without the statements presented at trial. (Doc. 10-6 at 53–54.)

The state court summarized trial counsel's testimony at the postconviction evidentiary hearing as follows.[6] Trial counsel chose not to file a motion for reconsideration because he lacked good faith to file the motion. (Doc. 10-6 at 178). Trial counsel opined that the predecessor judge considered all the evidence and fairly applied the law. (Doc. 10-6 at 178.) Trial counsel identified neither a misapprehension of law nor an unsubstantiated fact. (Doc. 10-6 at 178–79.) Trial counsel further opined that "there was overwhelming evidence[] in this case absent his statement." (Doc.10-6 at 179.)

The state court found trial counsel credible at the evidentiary hearing (Doc. 10-6 at 177), and the state court's credibility determination receives deference in federal court. *Nejad*, 830 F.3d at 1292. Because the state court accurately summarized trial counsel's testimony at the hearing, the state court did not unreasonably determine a fact. (Doc. 10-6 at 110–13.) Also, because trial counsel renewed the motion to suppress the confession before the admission of the confession at trial (Doc. 10-5 at 140–41, 253), which was denied, so the record refutes the claim. And the state court did not unreasonably apply *Strickland* by concluding that trial counsel's decision not to reconsider earlier motion to suppress was not deficient.

Even if trial counsel had moved for reconsideration, Rodriguez cannot establish prejudice because the successor judge would have likely denied the motion. At the

---

[6] The summary derives from the state court's order denying Rodriguez postconviction relief. (Doc. 10-6 at 178–79.)

suppression hearing, Rodriguez testified that the detective detained him in a cell and asked

for his lawyer's name and telephone number. (Doc. 10-4 at 221–22.) Rodriguez provided

the name and telephone number and asked, "Why do you want to call my lawyer?" (Doc.

10-4 at 222.) The detective responded that he wanted to tell the lawyer that Rodriguez was

involved in an incident. (*Id.*) Rodriguez asked if his wife was going to come to the police

station, and the detective said that if Rodriguez's wife would come, the detectives would

arrest her and authorities would take away Rodriguez's daughter. (Doc. 10-4 at 222–23.)

After the detective threatened Rodriguez, Rodriguez waived his constitutional rights,

including his right to have a lawyer present during questioning. (Doc. 10-4 at 224–25.)

During a subsequently recorded interview, the detective and Rodriguez together recounted

their conversation in the cell. (Doc. 10-4 at 227–28.) On cross-examination, Rodriguez

admitted that he failed to mention the detective's threats against Rodriguez and his family.

(Doc. 10-4 at 228–29.)

     In the order denying the motion to suppress, the predecessor judge found Rodriguez

not credible. (Doc. 10-3 at 260.) While the successor judge could have held a hearing to

reconsider that credibility finding, Rodriguez cannot show that the successor judge would

have found Rodriguez credible. Fla. R. Jud. Admin. 2.330(j) ("Prior factual or legal rulings

by a disqualified judge may be reconsidered and vacated or amended by a successor judge

based upon a motion for reconsideration . . . ."). Like the predecessor judge, the successor

judge could have concluded that Rodriguez's material omission from the subsequent recorded interview and knowing and voluntary waiver of his constitutional rights undercut his credibility. *Hawn v. State*, 300 So. 3d 238, 242 (Fla. 4th DCA 2020) ("'[A]n omission in a previous out-of-court statement about which the witness testifies at trial' can be considered an inconsistent statement for impeachment purposes, if the omission is a 'material, significant fact rather than mere details and would naturally have been mentioned.'"); *Pearce v. State*, 880 So. 2d 561, 569 (Fla. 2004) ("The theory of admissibility [of a prior inconsistent statement] is not that the prior statement is true and the in-court testimony is false, but that because the witness has not told the truth in one of the statements, the jury should disbelieve both statements.").

Also, at the suppression hearing, the detective testified that he asked Rodriguez for the name and telephone number of his lawyer. (Doc. 10-4 at 77.) Rodriguez asked why the detective wanted to contact his lawyer and whether his wife was coming to the police station. (Doc. 10-4 at 79–80.) After the detective answered Rodriguez's questions, Rodriguez began to confess his involvement in the crimes. (Doc. 10-4 at 82.)[7] The detective stopped Rodriguez and read Rodriguez his constitutional rights. (Doc. 10-4 at 84–86.) Rodriguez waived those rights including his right to have a lawyer present. (Doc.

---

[7] At trial, Rodriguez's wife testified that she saw Rodriguez leave with Acevedo on the night of the murder. (Doc. 10-5 at 46–48.) Before confessing, Rodriguez had told the detectives that he was with his wife the entire night of the murder (Doc. 10-5 at 224–29) and likely knew that she would not provide an alibi if she came to the police station for an interview.

10-4 at 84–86.) Because Rodriguez initiated further communication with the detective and the detective ensured that Rodriguez knowingly and voluntarily waived his constitutional rights, the successor judge would almost certainly not have granted the motion for reconsideration. *Edwards*, 451 U.S. at 485; *Bradshaw*, 462 U.S. at 1046. Consequently, trial counsel was not ineffective for not filing the motion. *Pinkney v. Sec'y, Fla. Dep't Corrs.*, 876 F.3d 1290, 1297 (11th Cir. 2017) ("[A]n attorney will not be held to have performed deficiently for failing to perform a futile act, one that would not have gotten his client any relief.").

Finally, even if the successor judge had granted the motion for reconsideration and suppressed the confession, Rodriguez could not show a reasonable probability that the outcome at trial would have changed. *Strickland*, 466 U.S. at 694. As explained above, even without Rodriguez's confession, overwhelming evidence proved his guilt. *Peoples*, 377 F.3d 1208, 1244; *Stevens*, 968 F.2d at 1081–82.

Ground Four is denied.

The Court therefore **ORDERS** that Rodriguez's Petition for Writ of Habeas Corpus (Doc. 1) is **DENIED**. The **CLERK** is directed to enter judgment against Rodriguez and **CLOSE** the case.

## V. <u>CERTIFICATE OF APPEALABILITY</u>

Rodriguez neither makes a substantial showing of the denial of a constitutional right nor shows that reasonable jurists would find debatable both the merits of the underlying claims and the procedural issues he seeks to raise. Therefore, a certificate of appealability and leave to appeal *in forma pauperis* are **DENIED**. 28 U.S.C. § 2253(c)(2); *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

**ORDERED** in Tampa, Florida, on September 7, 2021.


Kathryn Kimball Mizelle
United States District Judge